UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

MICHAEL E. McINERNEY,

        Debtor.
_____/

GENE R. KOHUT, TRUSTEE,

        Plaintiff,

vs.

ACKERMAN & ACKERMAN P.C., et al.,

        Defendants.
_____/

Case No. 11-58953

Chapter 7

Judge Thomas J. Tucker

Adv. Pro. No. 13-5292

**TRIAL OPINION**

**I. Introduction**

Because of several orders previously filed, all counts and claims in the Plaintiff's Complaint in this adversary proceeding (Docket # 1) have been resolved. The only claim that is not yet resolved is the counterclaim filed by Defendant Ackerman & Ackerman, P.C. (the "Ackerman Firm")(Docket # 68, the "Counterclaim"). The Court held a bench trial on the Counterclaim on April 28, 2015, and took it under advisement.

The Court has considered all of the arguments of the parties; all of the exhibits admitted into evidence at trial, namely Plaintiff's Exhibits 1, 3, 4, 5, and 6 and Defendant's Exhibit B; and all of the testimony of the trial witnesses, namely Darius Dynkowski, Alan Ackerman, and Gene Kohut. This opinion constitutes the Court's findings of fact and conclusions of law regarding the

Counterclaim.

For the reasons stated in this opinion, the Court will enter judgment for the Defendant Ackerman Firm on the Counterclaim in the amount of $324,023.49.

## II. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(B), and 157(b)(2)(O).

## III. Background and facts

Initially, the Court incorporates by reference into this opinion, as part of its findings of fact, all of the facts stipulated to by the parties in the Final Pretrial Order.[1] Next, the Court adopts and finds as fact the following things, which the Court stated in its December 24, 2014 opinion filed in the main case:[2]

> The state law action (the "Becker Action") was filed by McInerney in 2009, against Charles E. Becker and Becker Ventures, LLC (the "Becker Parties") in the Oakland County, Michigan Circuit Court. McInerney sought damages in excess of $9 million, based on claims of breach of contract; breach of fiduciary duty; unjust enrichment; and promissory estoppel. The suit arose out of two written agreements and an alleged oral agreement entered into between McInerney and the Becker Parties. This Court described and discussed the Becker Action at length in its first settlement opinion in this case. *See* [*In re McInerney*, 499 B.R. 574, 576-80, 584-97 (Bankr. E.D. Mich. 2013).]

---

[1] Final Pretrial Order (Docket # 76, the "Final Pretrial Order") at 3-5, Section 4 ("Stipulation of Facts and Law"), "Uncontested Facts," nos. 1-25.

[2] Opinion Regarding the Chapter 7 Trustee's Motion for Approval of Settlement with the Ackerman Defendants, filed December 24, 2014 (Docket # 679 in Case No. 11-58953), at 6-9. This opinion is reported in Westlaw at 2014 WL 7365869.

Before McInerney filed his voluntary petition in this bankruptcy case on July 12, 2011, under Chapter 11, he had been represented initially in the Becker Action by the Bush Seyferth firm. That firm had represented McInerney on an hourly-rate basis. After that firm withdrew, McInerney was represented by the Ackerman Firm. The Ackerman Firm was retained under a contingency-fee agreement with McInerney. Under that agreement, the parties agreed that the Ackerman Firm would be paid a fee "from the proceeds of the recoveries" from the claims against the Becker Parties, "a fee of 33-1/3 % of all monies recovered." In addition, McInerney agreed "to pay and reimburse to the law firm all costs, disbursements, and expenses incurred or deemed necessary by the law firm in handling the client's case."

By the time McInerney filed his Chapter 11 bankruptcy case, the state trial court in the Becker Action had granted summary disposition in favor of the Becker Parties on McInerney's claims, and had denied a motion for reconsideration filed by McInerney. And McInerney had appealed those decisions to the Michigan Court of Appeals. While that appeal was pending, but before briefs were filed in the Michigan Court of Appeals, McInerney filed his Chapter 11 case.

As debtor-in-possession in the Chapter 11 case, McInerney filed a motion seeking approval to employ the Ackerman Firm, to continue representing him in the Becker Action. Objections were filed, and the Court held a hearing and ultimately granted McInerney's motion, with modifications. In its Order filed November 9, 2011, this Court approved McInerney's employment of the Ackerman Firm as special counsel, on the same contingency-fee basis as in the pre-petition Contingent Fee Retainer Agreement.

While this bankruptcy case was in Chapter 11, the Ackerman Firm did substantial work, including the filing of extensive briefs in the Michigan Court of Appeals.

McInerney failed to obtain confirmation of a Chapter 11 plan, and on November 2, 2012, the Court converted this case to Chapter 7.

After the conversion, the Chapter 7 Trustee chose not to employ the Ackerman Firm to represent him in prosecuting the Becker Action. Thus, the Ackerman Firm's representation of the

3

bankruptcy estate in the Becker Action was terminated.

At the time of the conversion to Chapter 7 and the termination of the Ackerman Firm's employment as counsel in connection with the Becker Action, the status of that state court action was that McInerney's appeal had been fully briefed in the Michigan Court of Appeals, and was awaiting an oral argument date. The Chapter 7 Trustee and his counsel did no substantive work on the case in the Michigan Court of Appeals. Basically their only work on the matter in that court was to seek and obtain several delays by the Michigan Court of Appeals in setting any oral argument date, pending the outcome of the Trustee's efforts to settle the case and obtain bankruptcy court approval of the settlement.

The Chapter 7 Trustee and his counsel (Wolfson Bolton PLLC) investigated and evaluated the claims against the Becker Parties, and negotiated and sought approval of an initial proposed settlement that was denied by the Court, and a second, higher settlement that was approved by this Court.

On March 11, 2013, the Chapter 7 Trustee filed a motion seeking approval to compromise, on behalf of the bankruptcy estate, the Becker Action, for $250,000. Several creditors objected, including the Ackerman Firm, and the Court ultimately denied the Trustee's settlement motion as unreasonably low. The Court's opinion and the related order were filed on October 17, 2013. (The Court's opinion is published as *In re McInerney*, 499 B.R. 574 (Bankr. E.D. Mich. 2013).)

The Trustee then negotiated a higher settlement with the Becker Parties, this time in the amount of $1 million. The Trustee moved for approval of that higher settlement on November 13, 2013. Several creditors objected to that motion, including the Ackerman Firm, but the Court approved that higher settlement, in an opinion and related order filed August 7, 2014. (The Court's opinion regarding the second settlement motion is reported as *In re McInerney*, 516 B.R. 171 (Bankr. E.D. Mich. 2014).) The Becker Parties then paid the $1 million settlement amount to the bankruptcy estate.

(footnotes containing record citations omitted).

The Court makes additional findings in the next section of this opinion.

**IV. Discussion**

As the Court discussed in its December 24, 2014 opinion, and as the parties to the Counterclaim agree, the Ackerman Firm has an enforceable common law charging lien, under Michigan law, against the $1 million Becker settlement proceeds that the McInerney bankruptcy estate received. This common law charging lien secures the payment of the attorney fee and expense reimbursement that the Court finds the Ackerman Firm is entitled to for its work on the Becker lawsuit.

In the Final Pretrial Order[3] and at trial, the Plaintiff Trustee and the Defendant Ackerman Firm have agreed that the total of the expenses incurred by the Ackerman Firm in working on the Becker matter is $34,319.25. The parties agree, and the Court now concludes, that the Defendant Ackerman Firm is entitled to reimbursement of expenses in this amount.

The issue remaining is what attorney fee amount the Ackerman Firm is entitled to for its work on the Becker matter. The Court discussed in detail the law applicable to this issue at pp. 10-15 of its December 24, 2014 opinion. The Court adopts that discussion now, and incorporates it into this opinion by reference.

The Plaintiff Trustee and the Defendant Ackerman Firm agreed at trial, in effect, to the following. Because the cash value of the Becker settlement is $1 million, and because the reimbursable expenses incurred by the Ackerman Firm in working on the Becker matter total $34,319.25, the 1/3 contingent fee that the Ackerman Firm would be entitled to under its retainer agreement (Defendant's Exhibit B), would be $321,893.60, that is, *if* the Court were to find that

---

[3] *See* Final Pretrial Order at 5, stipulation no. 24.

5

13-05292-tjt    Doc 82    Filed 05/01/15    Entered 05/01/15 18:49:31    Page 5 of 12

100% of the bankruptcy estate's recovery of the $1 million Becker settlement amount is attributable to the Ackerman Firm, as compared to successor counsel.[4]

The Court agrees with the foregoing. The remaining dispute between the parties is what percentage of the bankruptcy estate's $1 million recovery is attributable to the Ackerman Firm's work on the Becker matter, before the November 2, 2012 conversion of the McInerney case to Chapter 7, when the Ackerman Firm's retention as counsel on the Becker matter terminated. At trial, the Ackerman Firm argued that its percentage is 100%; but the Plaintiff Trustee argued that the Ackerman Firm's percentage is no more than 15%.

In its December 24, 2014 opinion, at pp. 13-15, this Court described the applicable law as follows:

> More recently, in the 2013 case of *Island Lake Arbors Condominium Assn. v. Meisner & Associates, P.C.*, the Michigan Court of Appeals refined the quantum meruit analysis to be applied, at least in the case like this one, where the terminated attorney represented a party in a non-personal injury case on a contingency fee basis. The attorney in *Meisner* represented the plaintiff in a civil action against a condominium developer/builder. The fee agreement provided the attorney with a "reduced hourly rate supplemented by a 12 percent contingency fee, which would be calculated based on the cash value of any judgment or settlement reached with [the Defendant]." 837 N.W. 2d at 440. The attorney provided legal services for about 18 months before

---

[4] In so agreeing at trial, the parties adopted the method that the Court found to be correct in its December 14, 2014 opinion, for calculating the Ackerman Firm's contractual 1/3 contingent fee amount. As the Court calculated it:

> The net recovery from the settlement is $1 million minus expenses of $34,319.25, which equals $965,680.80. One-third of that amount is $321,893.60, which when added to the expenses, means a total of fee and expenses of $356,212.85 ($321,893.60 + $34,319.25 expenses = $356,212.85).

(December 24, 2014 Opinion at 17.)

6

the client terminated the attorney and retained new counsel. *Id*. The client had paid the attorney the agreed, reduced hourly-rate portion of his fee, but later, the client filed a declaratory judgment action, asserting that it owed the attorney no additional legal fees for the contingency part of the retainer agreement, from any recovery on the claim against the defendant in the civil action.

The Michigan Court of Appeals held that the attorney was entitled to a contingency fee for the contingency part of the agreement, based on "the quantum meruit approach described in" prior cases including *Morris*. *Id*. at 445. Among other things, the Court in *Meisner* adopted the following rule:

> In this case of first impression, we hold that the quantum meruit recovery of a discharged attorney is capped by the contingency-fee percentage set forth in the contract, applied to the amount of the recovery attributable to the attorney's work.

837 N.W. 2d at 446.

While the passage just quoted from *Meisner* refers to the calculation — "the contingency- fee percentage set forth in the contract, applied to the amount of the recovery attributable to the attorney's work" — as a *cap* on the attorney's quantum meruit recovery, *Meisner* then applied that calculation as the appropriate quantum meruit fee; not just the cap on such fee. The court held that in this context, the attorney's quantum meruit fee is *not* to be calculated by multiplying the number of hours worked by a reasonable hourly rate. Rather, the method of calculation is for the fact finder to *determine what portion of the cash value of the settlement is attributable to the attorney's work, and apply the contractual contingency-fee percentage to that amount*. The Court of Appeals explained this as follows:

> On remand, the fact finder must determine how much money Meisner is owed. The *Reynolds* Court instructed, "[Q]uantum meruit is generally determined by simply multiplying the number of hours worked by a reasonable hourly fee." *Reynolds*, 222 Mich.App. at 28, 564 N.W.2d 467. However, the *Reynolds* Court then specifically referred to the portions of *Morris* and *Plunkett* directing that the

7

contractual terms must also govern reasonable compensation for services rendered. In this case, as in *Morris*, those terms included a contingency arrangement. Thus, **we emphasize that it would be inappropriate to calculate Meisner's quantum meruit recovery on the basis of the number of hours worked multiplied by a reasonable hourly fee**. In their contract, the parties deliberately spurned an arrangement based solely on an hourly fee, and instead agreed that if it completed the work, Meisner would share a percentage of the recovery. Since Meisner's hourly fees have been paid, the remaining fact to be determined is the portion of the ultimate recovery attributable to Meisner's contribution.

**After the cash value of the settlement has been determined according to the method set forth in Meisner's contract with [the client], the fact finder must consider and compare the contributions to that recovery made by both Meisner and successor counsel. Once that determination has been made, Meisner is entitled to 12 percent of the recovery attributable to Meisner**. This method comports with the meaning of quantum meruit:" 'as much as deserved.'" . . . It also compensates Meisner according to the "actual deal struck between the client and the attorney[.]" *Reynolds* 222 Mich.App. at 30, 564 N.W.2d 467. The bargained-for-value percentage memorialized in the contract governs Meisner's recovery, which flows from Meisner's contribution to the outcome.

837 N.W. 2d at 448-49 (citations omitted; emphasis added).

Applicable Michigan law, therefore, requires this Court to determine what percentage of the $1 million cash value obtained from the Becker settlement was attributable to the work of the Ackerman Firm, compared to the percentage attributable to the work of counsel who succeeded the Ackerman Firm. That successor counsel was the Chapter 7 Trustee's attorneys, the Wolfson

8

Bolton firm. To make this percentage determination, in the words of the *Meisner* court quoted above, the Court "must consider and compare the contributions to [the settlement] recovery made by both" the Ackerman Firm "and successor counsel," the Wolfson Bolton firm.

The evidence at trial proved that the Wolfson Bolton firm, as attorneys for the Chapter 7 Trustee, did not participate in any of the negotiations with Becker that led to the $1 million settlement. Gene Kohut, the Chapter 7 Trustee, personally conducted all such settlement negotiations with the Becker side. While Mr. Kohut is an attorney, the evidence at trial shows that Mr. Kohut was acting only in his capacity as Trustee in conducting the settlement negotiations with Becker. He was not acting as an attorney for the Trustee (*i.e.*, as attorney for himself). So the Court does not consider that Mr. Kohut was a successor counsel to the Ackerman Firm for purposes of its *Meisner* analysis; rather, only Wolfson Bolton was such a successor counsel. Thus, while Mr. Kohut as Trustee himself contributed to the bankruptcy estate ultimately obtaining the $1 million settlement, his contribution is not relevant under the *Meisner* method of calculating a quantum meruit attorney fee. The contribution of *the client* — here the Plaintiff Trustee — toward obtaining a settlement does not factor into the *Meisner* analysis. What matters is the relative contributions of the terminated contingent-fee attorney (here the Ackerman Firm) and the successor attorney (here the Trustee's attorney, the Wolfson Bolton firm).

In its October 17, 2013 opinion, which rejected the Trustee's initial proposed settlement with Becker of $250,000,[5] the Court described the history of the work done by the Ackerman

---

[5] That opinion is filed at Docket # 545 in the main case (11-58953), and is reported at 499 B.R. 574.

Firm on the Becker litigation before its termination as counsel. And in that opinion the Court discussed in detail the claims and issues raised and preserved for appeal by the Ackerman Firm. The Court found that absent a settlement, the bankruptcy estate had a strong chance of prevailing it the pending appeal against Becker, and at a minimum, forcing a trial on the claim against Becker. The Court was persuaded of this, in large part, by the appeal briefs prepared and filed by the Ackerman Firm in the Michigan Court of Appeals. The Court's decision to deny approval of the Trustee's proposed $250,000 settlement with Becker, and its opinion explaining why such settlement amount was unreasonably low, led directly to the $1 million settlement that the Trustee was then able to negotiate with Becker, which the Court ultimately approved.

In short, the Court finds that the work of the Ackerman Firm on the Becker litigation was extremely important in enabling the Chapter 7 Trustee ultimately to obtain the $1 million settlement from Becker.

The work of successor counsel, the Wolfson Bolton firm, did also contribute to the $1 million settlement. It did so not by any litigation work on the Becker matter — no such work was done by Wolfson Bolton or anyone else after the Ackerman Firm's termination as counsel. Rather, the Court finds that Wolfson Bolton materially contributed as successor counsel in the following way (and only in this way): by preparing, filing, and successfully prosecuting, in the face of objections by several creditors (including the Ackerman Firm), the Trustee's motion for approval of the $1 million settlement with Becker.[6] That contribution by Wolfson Bolton means

---

[6] The Trustee, Gene Kohut, testified at trial that he consulted with his counsel from the Wolfson Bolton firm about the estate's claim(s) against Becker, before he negotiated the initial, $250,000 settlement with Becker, and that he also consulted with his counsel about the Court's rejection of that initial proposed settlement, before he negotiated the $1 million settlement. But Mr. Kohut's testimony was very general about this. The Court cannot find from the evidence that the Wolfson Bolton attorneys

10

13-05292-tjt    Doc 82    Filed 05/01/15    Entered 05/01/15 18:49:31    Page 10 of 12

that the $1 million obtained by the bankruptcy estate was, in part, attributable to the work of Wolfson Bolton, as successor counsel.[7]

In determining relative percentages in this context, of course, there is no way to calculate the percentages with any sort of scientific certainty or mathematical precision. But Michigan law, and in particular the *Meisner* case, requires the Court to make a determination of the percentages. Based on all of the evidence presented, and all of the relevant circumstances, the Court finds the following. As between the Ackerman Firm and the Wolfson Bolton firm (successor counsel), the bankruptcy estate's $1 million cash value obtained from the Becker settlement is attributable 90% to Ackerman Firm and 10% to the Wolfson Bolton firm (successor counsel).[8]

Under *Meisner*, therefore, the Ackerman Firm is entitled to a quantum-meruit based fee calculated as follows: The net recovery from the settlement is $1 million minus expenses of

---

materially contributed to the ultimate $1 million settlement by their unspecified work in advising the Trustee about the claim against Becker.

The Trustee notes that the Wolfson Bolton attorney also arranged to obtain delays from the Michigan Court of Appeals in setting an oral argument date on the pending appeal in the Becker litigation. The purpose of this was to delay appellate oral argument while the Trustee tried to settle the Becker claim. But it is not clear whether this delay contributed to the ultimate $1 million settlement or not. The Court cannot find from the evidence that it did; this is only speculative at best.

[7] The Ackerman Firm argued at trial that the Court should disregard the work of the Wolfson Bolton firm in preparing and prosecuting the settlement motion that led to the Court's approval of the $1 million settlement. Defendant argued that this was bankruptcy-administration work of the type that occurs in many bankruptcy cases, and that it should be viewed as having little or nothing to do with obtaining the $1 million settlement. The Court rejects Defendant's argument. Approval of the $1 million settlement, over the objections of several creditors, was a necessary and integral step in the bankruptcy estate's obtaining the $1 million from the settlement. Nothing in *Meisner* or in any other authority that the Court is aware of supports Defendant's argument.

[8] The Court notes for the record that the Wolfson Bolton firm is not working for the Chapter 7 Trustee on a contingent fee basis. The Court also notes that Trustee's counsel has not filed any fee applications to date in the Chapter 7 bankruptcy case.

11

$34,319.25, which equals $965,680.80. Ninety percent of that amount is $869,112.72. One-third of that amount, in turn, is $289,704.24. That is the fee that must be paid by the bankruptcy estate to the Ackerman Firm. When added to the expenses, that means that the bankruptcy estate must pay the Ackerman Firm a total of fee and expenses of $324,023.49 ($289,704.24 + $34,319.25 expenses = $324,023.49). This is the allowed amount of the Ackerman Firm's secured claim against the estate's $1 million Becker settlement proceeds, based on the Ackerman Firm's common law charging lien.

## V. Conclusion

For the reasons stated in this opinion, the Court will enter judgment for the Defendant Ackerman Firm on its Counterclaim in the amount of $324,023.49. Each party will bear his/its own costs.

**Signed on May 1, 2015**   /s/ Thomas J. Tucker
**Thomas J. Tucker**
**United States Bankruptcy Judge**